IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 11, 2005

**STATE OF TENNESSEE v. ANTHONY DWAYNE BROWN**

**Direct Appeal from the Circuit Court for Obion County**
**No. 3-338    William B. Acree, Jr., Judge**

_____

**No. W2004-01139-CCA-R3-CD  - Filed April 18, 2005**

_____

The defendant, Anthony Dwayne Brown, was convicted by jury of one count of first degree premeditated murder, two counts of felony murder, one count of especially aggravated robbery, two counts of especially aggravated burglary, and theft of property valued at less than $500.  The trial court merged the two felony murder counts into the first degree premeditated murder count and merged the theft offense into the count of especially aggravated robbery.  The trial court also merged the two counts of especially aggravated burglary.  The defendant was sentenced to life without the possibility of parole for the first degree premeditated murder.  The defendant was sentenced to sixty years for especially aggravated robbery and to thirty years for especially aggravated burglary.  The trial court ordered all sentences to run concurrent with the sentence of life without the possibility of parole.  The defendant raises two issues on appeal: (1) whether the evidence was sufficient to support his convictions; and (2) whether the trial court erred in excluding the testimony of a defense witness. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which David G. Hayes and John Everett Williams, JJ. , joined.

Joseph P. Atnip, District Public Defender, for the appellant, Anthony Dwayne Brown.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Facts and Procedural History**

On the morning of May 1, 2003, Hilon Pruitt, the victim in this case, did not show up for work.  Concerned, Jerry Sherrill, Sr., and William Crowell ("Mustard"), two co-workers and friends

of the eighty-one-year-old victim, went to his residence where they discovered his body lying face up in the living room. A console television was turned over and lying on his legs, butcher knives were sticking out of his abdomen and neck, and an ice pick protruded from the center of his neck. A portable television that had been smashed down on his head was lying beside his body. Sherrill and Mustard lifted the television off the victim's legs and called the police.

Police officers, Tennessee Bureau of Investigation (T.B.I.) Agent Joe Walker, and the county medical examiner, Dr. Allen C. Gooch, soon arrived at the scene. Inside the home, Agent Walker searched for fingerprints left by the assailant, finding a blood pattern in the dining room and a palm print on the back of the television. The pattern in the print on the television indicated that the assailant had worn gloves. The unidentified assailant left the kitchen utensil drawer open and the victim's billfold lying beside his body. Although the billfold contained no cash, approximately $900 was found in the victim's front right shirt pocket. A trigger guard and a firing mechanism also lie next to the victim's body, but no gun was ever recovered.

Based upon the condition of the victim's body, Dr. Gooch determined the time of death to have been between 7:00 p.m. and 12:00 a.m. on the previous night of April 30, 2003. An autopsy revealed that the cause of death was the result of multiple injuries, including eight major stab wounds to the victim's body as well as blunt injuries to his head and neck. Dr. O.C. Smith, who was responsible for performing the autopsy, could not determine whether an unfound item may have caused some of the injuries or whether more than one assailant perpetrated the crime.

The defendant was charged with the crimes based upon the testimony of several witnesses. However, initially, several other suspects were considered due to their histories, including Scott Haynes. Haynes was stopped by police officers for questioning regarding a separate home invasion that occurred in Crockett County two nights after the murder of the victim in this case. This home invasion also involved the assault of an older man. When stopped, Haynes took off running. An inventory search of Haynes' vehicle uncovered a glove with a weave pattern similar to the weave pattern in the print found at the victim's home. However, the glove was a common "stock variety glove," and the palm print was never checked against that of Haynes. Because no physical evidence connected Haynes to the crime, Agent Walker ultimately disregarded Haynes as a potential suspect. Furthermore, Haynes had an alibi: his stepdaughter, Joyce Cavness, stated that Haynes was having a cookout the night of April 30, 2003, and that she was there until 8:30 p.m. or 9:00 p.m.

At trial, the victim's daughter, Linda Brown, testified that her father would have been asleep by 9:00 p.m. and that he did not leave her house on the night of April 30, 2003, until about 7:15 p.m. Milton Snow testified that he received a call from his nephew, the defendant, around 8:40 p.m. on the evening of the murder. Snow, who stated that he was babysitting at the time, testified that the defendant confessed to killing the victim. Snow stated that the defendant admitted to stabbing the victim and to pushing a television onto his head. Snow stated that the defendant showed him twelve dollars stained with blood which he stated that he had stolen from the victim.

Joshua McElrath testified that he saw the defendant on the basketball courts on Nash Street at about 8:30 p.m. on the night of the victim's murder. Contrary to Snow's testimony that he was babysitting, McElrath stated that Snow was at the basketball courts with him and the defendant. The defendant looked "like he had just got out of the shower or something . . . he was nervous." McElrath testified that the defendant then confessed the crime to him, stating that "the old man jumped on his back" and that he just "snapped and he killed him." At first McElrath did not believe the defendant, so he followed the defendant over to the victim's house and saw "the old man laying on the floor with some knives in him." McElrath stated that the defendant did not implicate anyone else in the crime.

Robbie Walker testified that he saw the defendant coming from the side of the victim's house about four days prior to the murder and that he appeared nervous and sweating. She remembered overhearing the defendant recount the murder while she pretended to be asleep. Walker stated that the defendant admitted that "he got high off some pills, and he didn't have nothing to do, so he went over there and he beat the old man till his arms got tired, then he started sticking the old man." Walker stated that the defendant referred to the victim's blood as red "Kool-Aid," the defendant's favorite color. Contrary to Walker's belief that the defendant was speaking to Snow and "Tie Dye," an alleged nickname for Stacey Parham, Parham denied ever being present. Parham stated it was only later that he asked the defendant about the crime and was told "stay out of my business."

During the course of the trial, the State also introduced several witnesses who testified that, while in jail, the defendant admitted his involvement in the crime. Timothy McPherson, who stated that he was in the same jail pod with the defendant, testified that the defendant told other inmates that he had messed up his life because he killed a man over twelve dollars.

Joseph Isbell testified that the defendant was showing crime scene pictures that he had received from his lawyer around in jail. Isbell stated that the defendant admitted to the crime, but implicated a second assailant. Isbell testified that the defendant admitted to getting the knives out of the victim's drawer and that he was retaliating because the "man was calling the police and stuff on him saying they was trafficking and stuff, a lot of trafficking."

Jerry Sullivan also testified to overhearing the defendant admit to the murder while in jail. Sullivan stated:

> [The defendant] told about how they got together, him and this dude got high, snorted some powder, smoked some weed, and told the dude they was going to get him. So he snuck up on him in his house, and dude was bending over looking at the television, or doing something, and he snuck up on the dude and told the dude, "Hey, what did I tell you about what I was going to do to you?" So when the dude turned around - - see, I didn't know it was an old man at that time. I thought it was a young dude about like our age, that he was trying to interfere with dude's business out there on the street. . . . So when dude turned around, he said, "Didn't I tell you what I was going to do to you," the old man said, "Whatcha doing here," and he stabbed him in

the stomach.

Sullivan also testified that the defendant implicated another assailant in the crime.

Timothy Carr was also in the same jail pod with the defendant. Carr testified that the defendant "admitted to doing some of it, but he said he didn't act alone." Carr stated that the defendant implicated McElrath as the other assailant. Carr further testified that the defendant has threatened him and asked him to ensure that Snow and Walker were not available to testify. According to Lieutenant Rick Kelly of the Union City Police Department, the defendant is affiliated with the Vice Lords, whereas Carr is affiliated with a rival gang, the Gangster Disciples.

The defense argued that T.B.I. forensic scientists, Darrin Shockey and Donna Nelson, were not able to match any physical evidence from the scene to the defendant. The only DNA present under the victim's fingernails and at the scene was either the victim's own or matched to an unknown person. The defense urged the jury to consider the possibility that the crime was committed by one of the other initial suspects. Kay Perkins, who lived near the victim, testified to seeing Haynes and another man riding up and down the streets in the neighborhood "a couple of days to a week prior to the murder." Nolan Simms also testified to seeing Haynes in the area near the time of the murder, at Jerry Sherrill's salvage yard. Ann Sellers, another neighbor, saw a "strange car" pull into the neighborhood on the night of the victim's murder. Sellers testified that two white males "dressed like womens" exited the car and then, about twenty or thirty minutes later, "left like they was in a hurry."

The defense also attempted to introduce the testimony of Pam Byrd, and the State requested "a jury-out hearing on the relevance." Byrd was stabbed about twelve years ago by her ex-husband, Robert Kimmons,[1] another initial suspect in this case. The defense sought to introduce her testimony because "it demonstrates that one of the two suspects . . . had a tendency to use a knife." The trial judge sustained the State's objection to the testimony, stating: "she will not be allowed to testify to something that Mr. Kimmons did 12 years ago. There's nothing to tie Mr. Kimmons to this case."

At the conclusion of the evidence, the jury found the defendant guilty of premeditated first degree murder; two counts of felony murder, especially aggravated robbery, two counts of especially aggravated burglary, and theft of property valued at under $500.

During the sentencing phase of the trial, the State requested the trial court to impose a life sentence without the possibility of parole. The trial court stated:

> Mr. Brown, you've been convicted of three different counts of first degree murder. Counts 2 and 3 shall be merged into Count 1, which is premeditated murder. In accordance with the verdict of the jury, you are sentenced to life imprisonment without the possibility of parole.

---

[1] "Robert Kimmons" is one and the same as "Robert Kemmons," as his name is later spelled in the record.

A subsequent hearing for sentencing on the remaining charges was held on April 30, 2004. The trial court stated:

> Mr. Brown, in addition to the homicide sentence, you have two Class A sentences - - two Class A felonies to be sentence[d]. The record is clear that you are a career offender. The mandatory sentence for a career offender who has been convicted of a Class A felony is 60 years. The only decision that the Court has about that is . . . whether to run them concurrently or consecutively. In view of your life without parole record, I don't see any need to run these consecutively. I am going to run the two sentences concurrently.[2]

At the hearing, the defendant's motion for new trial was also heard. The trial court denied the motion and, alongside other grounds presented in the motion, addressed both issues which the defendant now presents on appeal:

> Ground No. 1 is that the evidence contained in the record is insufficient, as a matter of law, to support the verdict of guilty - - of the jury finding the defendant guilty. The Court thinks that the evidence is sufficient, as a matter of law, to support the verdict of guilty. There were a number of witnesses who testified in this case. . . . Seven separate witnesses. All related conversations that they had with [the defendant] in which [he] made admissions of guilt. That is not the only testimony in the record of the guilt of [the defendant], but those are all people who [he] knew and talked with and admitted guilt . . . . [F]rom the testimony of those witnesses, the evidence is more than sufficient to convict him beyond a reasonable doubt.
>
> . . . .
>
> The second ground is, the Trial Court erred in not permitting the testimony of Ms. Pam Byrd to be admitted into evidence. That testimony was tendered to the Court. Basically, her testimony was that she was previously married to a man named Kemmons, that she was assaulted by him during their marriage. She was stabbed a number of times. The significance of Mr. Kemmons is that the defense argued that the jury might ought to consider him as having committed the crime rather than [the defendant], because he was a suspect at one time in the case. There was no evidence whatsoever in the case that . . . Mr. Kemmons was in any way involved with this murder. The defense was unable to produce any evidence to tie him in other than some investigation being made at the front-end of the case, or right after the crime occurred. The Court does not find it was error to [not] permit Ms. Byrd to testify, and I think it was completely irrelevant.
>
> . . . .
>
> The motion for new trial is denied.
>
> The defendant then filed notice of appeal.

---

[2] In contrast to this statement, the record reflects that the defendant was being sentenced on only one Class A felony, especially aggravated robbery. The second offense, especially aggravated burglary, is a Class B felony. However, the record reflects that the judgments were entered properly and in accordance with the sentencing guidelines.

## II. Analysis

### Sufficiency of the Evidence

The defendant contends that the evidence was insufficient to support any of his convictions. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Moats, 906 S.W.2d 431, 433 (Tenn. 1995) (citation omitted). The Tennessee Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder can be defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2003).

Whether an act was done with premeditation is a question for the jury and may be inferred from the manner and circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Since the trier of fact cannot speculate as to what was in the defendant's mind, the existence of facts of premeditation must be determined from the defendant's conduct in light of the surrounding circumstances. See State v. Hall, 958 S.W.2d 679, 704 (Tenn. 1997). Several relevant circumstances have been held to provide the requisite indicia of premeditation:

> [T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.

State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998).

Taken in the light most favorable to the State, the evidence reveals that the defendant entered the victim's home and killed the victim with premeditation. The trial court noted that seven separate witnesses "related conversations that they had with [the defendant] in which [he] made admissions of guilt." The defense argues that inconsistencies in some of the witnesses' testimonies shed doubt upon their validity and contends that some of the witnesses are gang-affiliated and therefore biased. However, such questions involving the credibility of witnesses and the factual issues underlying the alleged inconsistencies are to be determined by the jury. The jury accredited the testimony of the State's witnesses.

The factors that provide the indicia for premeditation are established by the evidence and could be found by a rational trier of fact. No evidence indicates that the elderly victim was armed at the time that he was beaten and stabbed. Based upon the cause of death and instrumentalities used, a jury could have found that the nature of this murder was particularly cruel. Furthermore, a jury could find premeditation after hearing the testimony of Isbell: the defendant was retaliating because the "man was calling the police and stuff on him saying they was trafficking and stuff, a lot of trafficking." Consequently, the evidence is clearly sufficient to sustain the defendant's conviction for first degree premeditated murder.

In order to sustain the jury's findings of guilt for each of the defendant's two first degree felony murder convictions, we must first find that the evidence is sufficient to support the underlying felony convictions. Especially aggravated robbery underlies the defendant's first felony murder conviction. Tennessee Code Annotated section 39-13-401(a) (2003) defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2003).

Especially aggravated burglary underlies the defendant's second felony murder conviction. A person commits aggravated burglary when he or she enters a habitation without the effective consent of the owner and "commits or attempts to commit a felony, theft or assault" or enters with

the "intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a), -403(a) (2003). Especially aggravated burglary is the above accompanied by serious bodily injury to the victim. Tenn. Code Ann. § 39-14-404 (2003).

The defendant's conduct obviously constituted especially aggravated burglary because the jury concluded that he entered the victim's home without consent and committed theft and a murder. The evidence is also sufficient to support a conviction for especially aggravated robbery. The victim's billfold was found devoid of money lying near his body. At trial, McPherson testified that the defendant had told people that he had messed up his life because he killed a man over twelve dollars. Snow stated that the defendant showed him twelve dollars stained with blood which he had stolen from the victim. A jury could have easily found that the defendant instilled fear into the eighty-one year old victim and committed the theft and murder using deadly weapons: knives and an ice pick. Thus, the evidence supports the defendant's convictions for especially aggravated robbery and especially aggravated burglary. Upon finding that the evidence supports the commission of these felonies during the course of the murder, we hold that the evidence was sufficient to enable a rational trier of fact to find the defendant guilty of first degree felony murder.

The final conviction that the jury imposed was for theft of property valued at under $500. The same above-stated reasons that the evidence supports the especially aggravated robbery charge under which this offense was merged support this conviction.

**Exclusion of the Defendant's Witness**

The defendant raises in his motion for new trial and on appeal that the trial court erred in excluding the testimony of Pam Byrd. During an offer of proof at trial, Byrd testified that Kimmons was her ex-husband and that he had stabbed her about twelve years ago. The defendant sought to introduce this evidence to show that Kimmons, who was once a suspect in this case, had a history of stabbing and may have committed this murder.

In Tennessee, the determination of whether evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left in the sound discretion of the trial judge. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. 1999). A trial court's ruling on the admissibility of evidence will be disturbed only upon a clear showing of abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). An abuse of discretion exists when the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." See State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). In determining admissibility, a trial court must first decide if the evidence is relevant. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

In this case, the trial court followed the proper procedure of determining whether the evidence was relevant before excluding the witness' testimony. The trial court conducted a jury-out

hearing in which it carefully considered the relevance and remoteness of the proffered testimony. The trial court concluded, "she will not be able to testify to something that Mr. Kimmons did 12 years ago. There's nothing to tie Mr. Kimmons to this case." When the trial court addressed this issue at the hearing on the defendant's motion for a new trial, it stated: "[t]here was no evidence whatsoever in the case that . . . Kemmons was in any way involved with this murder. The defense was unable to produce any evidence to tie him in other than some investigation being made at the front-end of the case, or right after the crime occurred. . . . I think it was completely irrelevant."

Applying the foregoing principles, we conclude that the trial court did not abuse its discretion by disallowing Byrd to testify at trial. The trial court conducted a jury-out hearing and determined the evidence to be irrelevant. Nothing in the record indicates that the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." Accordingly, this issue is without merit.

### III. Conclusion

Following our review of the record, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE